## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **BETTY J. JESSEE,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 2:19cv00038 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| **ANDREW M. SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | By:  PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

### I.  Background and Standard of Review

Plaintiff, Betty J. Jessee, ("Jessee"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 1381 *et seq*. Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966).  "'If there is evidence to justify a refusal to direct a verdict were the

case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Jessee protectively filed her application for SSI on March 17, 2016, alleging disability as of May 1, 2009,[1] based on vision loss in her left eye; diabetes; back problems; depression; memory loss; tendinitis in the left knee; inability to lift with her left arm due to left shoulder pain; right arm and leg pain; learning difficulties; shortness of breath; and heart issues. (Record, ("R."), at 13, 198-201, 223, 240.) The claim was denied initially and upon reconsideration. (R. at 116-18, 122-24, 127-28, 130-32, 134-36.) Jessee then requested a hearing before an administrative law judge, ("ALJ"). (R. at 137-38.) The ALJ held a hearing on April 3, 2018, at which Jessee was represented by counsel. (R. at 38-65.)

By decision dated August 29, 2018, the ALJ denied Jessee's claim. (R. at 13-31.) The ALJ found that Jessee had not engaged in substantial gainful activity since March 17, 2016, the application date. (R. at 16.) The ALJ determined that Jessee had severe impairments, namely diabetes mellitus; coronary artery disease with hypertension; status-post myocardial infarction and stent placement; left eye amblyopia; lumbar degenerative disc disease; intellectual developmental disorder; major depressive disorder; and generalized anxiety disorder, but she found that Jessee did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-17.) The ALJ found that Jessee had the residual functional

---

[1] Jessee filed applications for disability insurance benefits, ("DIB"), and SSI on October 13, 2011, alleging disability beginning May 1, 2009. (R. at 69.) By decision dated October 21, 2014, the ALJ denied Jessee's claims. (R. at 69-76.)

capacity to perform simple, repetitive, unskilled light[2] work that required no more than occasional climbing of ramps and stairs, balancing, kneeling, stooping and crouching; that did not require her to crawl or climb ladders, ropes or scaffolds; that did not require her to work around hazards, such as machinery, rapidly moving parts, unprotected heights and vibrating surfaces; that did not require even moderate exposure to temperature extremes, excess humidity and pulmonary irritants; that allowed her to use her left eye for occasional far and near acuity, depth perception, field of vision and accommodation in work that required little reading; that did not require performance of assembly jobs dealing with small items less than one inch in diameter or use of a computer monitor greater than two hours in a day; that did not require driving; and that required no more than occasional interaction with the general public. (R. at 21-22.) The ALJ also found that Jessee could attend, persist and concentrate for two-hour intervals with normal breaks as allowed by the employer, but that she was able to complete a normal eight-hour workday and 40-hour workweek. (R. at 22.) The ALJ found that Jessee was able to perform her past work as a housekeeper. (R. at 29.) In addition, based on Jessee's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Jessee could perform, including the jobs of a hand presser, a folder/sorter and a cafeteria attendant. (R. at 29-30.) Thus, the ALJ concluded that Jessee was not under a disability as defined by the Act and was not eligible for SSI benefits. (R. at 30-31.) *See* 20 C.F.R. § 416.920(f), (g) (2019).

After the ALJ issued her decision, Jessee pursued her administrative appeals,

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2019).

(R. at 194, 280-82), but the Appeals Council denied her request for review. (R. at 1-5.) Jessee then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2019). This case is before this court on Jessee's motion for summary judgment filed February 21, 2020, and the Commissioner's motion for summary judgment filed March 19, 2020.

## II. Facts

Jessee was born in 1971, (R. at 42, 198), which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. § 416.963(c). She participated in special education classes and completed the eighth grade, but was held back to repeat it.[3] (R. at 42, 210, 224.) Jessee has past work experience as a housekeeper. (R. at 44.) Jessee stated that she was not "very good" at reading, writing, adding, subtracting and counting money. (R. at 43.) She stated that she had difficulty seeing "anything out of [her] left eye." (R. at 45.) In 2016, Jessee had a heart attack and a stent was placed. (R. at 45.) Jessee stated that she was not taking any medication due to lack of finances. (R. at 49-50.) She stated that she had not told her pharmacist or doctor that she could not afford her medications. (R. at 50-51.) Jessee stated that she had never had a driver's license due to her vision problems. (R. at 53.)

Gerald Wells, a vocational expert, also was present and testified at Jessee's hearing. (R. at 58-64.) Wells classified Jessee's past work as a housekeeper as

---

[3] Jessee withdrew from school in August 1988 and did not repeat the eighth grade. (R. at 210.) Jessee reported that she was retained in kindergarten, fifth grade and possibly seventh grade. (R. at 868.)

light, unskilled work. (R. at 59.) Wells testified that a hypothetical individual of Jessee's age, education and work history, who had the residual functional capacity to perform light work; who could occasionally climb ramps and stairs, balance, kneel, stoop and crouch; who could never crawl; who should avoid hazards, such as machinery, rapidly moving parts, unprotected heights, climbing of ladders, ropes and scaffolds and vibrating surfaces; who should avoid moderate exposure to temperature extremes, excess humidity and pulmonary irritants; who could occasionally use her left eye for far and near acuity and depth perception; who would require little reading; who could not perform assembly jobs dealing with small items less than one inch in diameter; and who could use a computer monitor up to two hours total in an eight-hour workday, could perform Jessee's past work as a housekeeper. (R. at 59-60.) He stated that such an individual also could perform other work that existed in significant numbers, including jobs as a hand presser, a folder/sorter and a cafeteria attendant. (R. at 60-61.)

Wells then was asked to consider the same hypothetical individual, but who could understand, remember and carry out only simple instructions in repetitive, unskilled work, who could attend, persist and concentrate for two-hour intervals with normal breaks as allowed by the employer, but could complete a normal eight-hour workday and 40-hour workweek, and who could have only occasional interaction with the general public. (R. at 61-62.) He stated that such an individual could perform all the jobs previously identified. (R. at 62.) Wells stated that, should the hypothetical individual be limited as indicated by Dr. Vu, the hypothetical individual would be limited to less than sedentary[4] work. (R. at 62-

---

[4] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often

63.) Wells stated that there would be no jobs available that such an individual could perform based upon the individual's limitation on her ability to sit. (R. at 63-64.)

In rendering her decision, the ALJ reviewed medical records from Virginia Public Schools; Joseph Leizer, Ph.D., a state agency psychologist; Dr. Donald Williams, M.D., a state agency physician; Eric Oritt, Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Southern Medical Group; Dr. Edmund T. Vu, D.O.; Melinda M. Fields, Ph.D., a licensed psychologist; Johnston Memorial Hospital; Norton Community Hospital; Mountain View Regional Medical Center; and Appalachia Family Health.

By way of background, Jessee underwent left eye surgery in 1975, and her vision in that eye remained impaired afterward. (R. at 656, 848.) From 2011 through 2014, Jessee was diagnosed with back pain; chest pain; myocardial infarction; hypertension; hyperlipidemia; type II diabetes mellitus; and lower left leg pain and patellar tendonitis. (R. at 316, 330, 335, 682, 829, 837, 840, 843, 847.) In April 2014, Jessee complained of left leg pain, yet, x-rays of her left knee were normal. (R. at 311-19.) An ultrasound of Jessee's left lower extremity showed no evidence of deep vein thrombosis. (R. at 319.) In August 2014, Jessee again complained of left leg pain that radiated into her left hip. (R. at 679-83.) Examination revealed tenderness to palpation of the left lower leg with full range of motion; tenderness in the distal patellar tendon of the left knee with full range of motion; and left hip tenderness at the sciatic notch with full range of motion. (R. at

---

necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 416.967(a) (2019).

681.) She was diagnosed with lower leg pain and patellar tendonitis. (R. at 682.)

In October 2015, Jessee was involved in a motor vehicle accident. (R. at 378-88.) At that time, x-rays of Jessee's cervical spine showed spondylosis at the mid spine; stenosis of the leftward C5-6 intervertebral canal; and minimal narrowing at the C3-4 disc space. (R. at 385.) X-rays of her pelvis and left shoulder were normal. (R. at 385-86.) On October 25, 2015, Jessee complained of neck, left arm and shoulder pain and headaches. (R. at 417-26.) She denied psychiatric and behavioral problems. (R. at 421.) Jessee's neck had normal range of motion; her heart had regular rate and rhythm; her left shoulder had decreased range of motion, tenderness and pain; her cervical spine had decreased range of motion, tenderness, pain and spasm; she had normal muscle tone and strength; her reflexes were normal; she had intact sensation; and her mood and affect were normal. (R. at 422.) X-rays of Jessee's cervical spine showed mid cervical spondylosis with central spinal stenosis, and a CT scan of Jessee's head showed no acute intracranial abnormality. (R. at 424-25.)

On April 18, 2016, Jessee suffered a myocardial infarction which required cardiac stent placement. (R. at 461-81, 499-534.) Jessee's symptoms improved with treatment. (R. at 733, 754.) On April 26, 2016, Jessee denied chest pain; shortness of breath; palpitations; fainting spells; edema; and cyanosis. (R. at 611.) Dr. Esther Ajjarapu, M.D., a physician with Appalachia Family Health, reported that Jessee's mood was euthymic with an appropriate affect; she had a normal heart rate and rhythm; she had no edema, cyanosis or clubbing; she had a normal gait; she had normal motor strength, tone and bulk; her recent and remote memory were intact; and she had appropriate judgment and good insight. (R. at 610-12.) On May 4, 2016, Jessee was admitted to Norton Community Hospital for complaints of

numbness and tingling in her right upper extremity. (R. at 487-98, 542-72.) A chest x-ray showed a small vague nodular density projected over the anterior second rib. (R. at 496.) A CT of Jessee's head showed mild atrophy, and an MRI of her brain showed a disconjugate gaze.[5] (R. at 498, 558.) Upon examination, Jessee's heart had a regular rate and rhythm, her extremities had no cyanosis, clubbing or edema, and her behavior was appropriate and cooperative. (R. at 581.) A transient ischemic attack, ("TIA"), was ruled out, and Jessee was discharged on May 6, 2016. (R. at 491, 542.) On May 20, 2016, Jessee complained of fast heart rate, palpitations and shortness of breath during exertion. (R. at 573.) She denied chest pain; lower extremity edema; muscle aches and weakness; anxiety; and depression. (R. at 573.) Upon examination, Jessee's mood and affect were appropriate; she had a normal heart rate and rhythm; she had no edema in her extremities; her lungs had normal air movement with no wheezing; her back had full range of motion with no tenderness; she had a normal gait and station; she had normal motor strength and tone; and she had no obvious mood disorder. (R. at 575-76.) Dr. Nick G. Cavros, M.D., a physician with Mountain States Medical Group, diagnosed coronary artery disease, diabetes mellitus and hypercholesterolemia. (R. at 576.) He noted that Jessee had adequate disposition for an exercise program. (R. at 576.)

On June 3, 2016, Jessee denied chest pain, shortness of breath, palpitations, fainting spells, edema and cyanosis. (R. at 608.) Dr. Ajjarapu reported that Jessee's mood was euthymic with an appropriate affect; she had a normal heart rate and rhythm; she had no edema, cyanosis or clubbing; she had a normal gait; she had normal motor strength, tone and bulk; her recent and remote memory were intact; and she had appropriate judgment and good insight. (R. at 608.)

---

[5] Disconjugate gaze is defined as unpaired movements of the eyes. *See* https://medical-dictionary.thefreedictionary.com/disconjugate+gaze (last visited Jan. 15, 2021).

On August 23, 2016, Jessee presented to the emergency department at Norton Community Hospital for complaints of chest pain. (R. at 622-47.) Jessee admitted to forgetting to take her nitroglycerin medication. (R. at 623.) Chest x-rays showed no acute cardiopulmonary abnormality. (R. at 623, 646-47.) Examination revealed that Jessee's heart had a regular rate and rhythm; her extremities had no edema, cyanosis or clubbing; her muscle strength was normal in all extremities; she had no neurological deficits; and she had an appropriate mood and affect. (R. at 631.) It was noted that Jessee could resume normal activity. (R. at 623.)

On August 27, 2016, Dr. Edmund T. Vu, D.O., examined Jessee at the request of Disability Determination Services. (R. at 656-59.) Jessee stated that she could not work due to "lower back pain,[6] bilateral knee pain and a heart attack." (R. at 656.) She reported some shortness of breath when walking short distances. (R. at 656.) Jessee was independent with her activities of daily living. (R. at 656.) Upon examination, Jessee's heart had a regular rate and rhythm with no murmur, gallop, click or rub; she had paraspinal lumbar musculature tenderness on the right; her iliotibial, ("IT"), band of the right leg had tenderness to palpation; straight leg raising tests were negative; she had full grip strength in both hands; she had full muscle strength and tone in all muscle groups; she had intact sensation; her left shoulder drop test was positive; she had a normal gait and station; she was able to bend and squat without difficulty; she had no edema, cyanosis or erythema in her extremities; she had no abnormal reflexes; she did not appear to be depressed or

---

[6] On August 17, 2016, x-rays of Jessee's lumbar spine showed facet degenerative changes in the lower two levels. (R. at 619.) That same day, x-rays of Jessee's left shoulder were normal. (R. at 620.)

anxious; she was able to communicate with no deficits; her recent and remote memory was intact; and she had good insight and cognitive function. (R. at 657-58.) Dr. Vu diagnosed right IT band dysfunction; lumbago; left shoulder pain; left eye blindness; status-post heart attack with stent placement; diabetes mellitus; hyperlipidemia; and hypertension. (R. at 658.)

Dr. Vu opined that Jessee could sit for a partial workday; she was limited in standing and walking; she could not walk short distances; she could infrequently lift and carry items weighing less than 10 pounds; she was limited in her ability to carry items overhead; she could not work in dangerous environments or on uneven terrain; she could respond appropriately to questions; and she could carry out and remember instructions. (R. at 658.)

On August 30, 2016, Joseph Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Jessee suffered from nonsevere affective disorders. (R. at 87-89.) He found that Jessee had no restrictions on her activities of daily living; mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and she had experienced no repeated episodes of extended-duration decompensation. (R. at 88.)

On August 30, 2016, Dr. Donald Williams, M.D., a state agency physician, found that Jessee had the residual functional capacity to perform light work. (R. at 90-92.) He found that Jessee could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; she could not climb ladders, ropes and scaffolds; and she should avoid concentrated exposure to vibration, machinery and heights. (R. at 90-92.) Dr. Williams noted that, due to vision loss in the left eye, Jessee had

limited near and far acuity. (R. at 91.) No manipulative or communicative limitations were noted. (R. at 91.)

On October 5, 2016, Jessee presented to the emergency department at Norton Community Hospital for complaints of shortness of breath and dizziness. (R. at 732-53.) Chest x-rays showed no acute cardiopulmonary process. and an electrocardiogram, ("EKG"), was within normal limits. (R. at 713, 733.) Jessee was discharged the following day and advised to perform activities as tolerated. (R. at 734.) Jessee's discharge diagnoses were dyspnea; possible acute coronary syndrome; hyponatremia; leukocytosis; elevated alkaline phosphatase; coronary artery disease with history of myocardial infarction; diabetes mellitus type II; mixed hyperlipidemia; hypertension heart disease; gastroesophageal reflux disease, ("GERD"); depression; and urinary tract infection. (R. at 733.)

On October 28, 2016, Jessee denied muscle aches and weakness, anxiety and depression. (R. at 754.) Dr. Cavros reported that Jessee had an appropriate mood and affect; her heart had a normal rate and rhythm with no gallops, clicks, rubs or murmurs; her back revealed no tenderness and full range of motion; she had a normal gait and station; she had normal motor strength and tone; and she had no obvious mood disorder. (R. at 756-57.) He noted that Jessee's coronary artery disease was stable. (R. at 757.) On November 2, 2016, a transthoracic echocardiogram, ("TTE"), showed mild thickening/calcification of the anterior mitral leaflets; mild mitral valve regurgitation; and mild tricuspid regurgitation. (R. at 791-92.)

On November 8, 2016, Eric Oritt, Ph.D., a state agency psychologist, completed a PRTF, indicating that Jessee suffered from nonsevere affective

disorders. (R. at 103-04.) He found that Jessee had no restrictions on her activities of daily living; mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and she had experienced no repeated episodes of extended-duration decompensation. (R. at 103.)

On November 8, 2016, Dr. Richard Surrusco, M.D., a state agency physician, found that Jessee had the residual functional capacity to perform light work. (R. at 105-08.) He found that Jessee could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; she could not climb ladders, ropes and scaffolds; and she should avoid concentrated exposure to vibration, machinery and heights. (R. at 106-07.) Dr. Surrusco noted that, due to vision loss in the left eye, Jessee had limited near and far acuity. (R. at 106.) No manipulative or communicative limitations were noted. (R. at 106-07.)

On December 30, 2016, Jessee complained of right hip pain. (R. at 821-23.) Upon examination, Jessee's heart had normal rate and rhythm; her gait was normal; she had right hip tenderness to palpation, but normal range of motion; no joint instability in the right upper extremity; and she had appropriate judgment and good insight. (R. at 823.) She was diagnosed with right hip pain. (R. at 823.)

On January 22, 2017, Jessee presented to the emergency department at Norton Community Hospital for complaints of chest pain. (R. at 802-16.) An EKG was normal. (R. at 814.) Jessee's heart had regular rate and rhythm, normal pulses and no rubs or murmurs; her musculoskeletal examination was normal; and her sensory and motor systems were intact. (R. at 814.) Jessee was diagnosed with chest pain. (R. at 815.) On June 15, 2017, Jessee presented to the emergency department at Norton Community Hospital for complaints of chest pain and

nausea. (R. at 799-800.) An EKG was normal. (R. at 796-801.) Jessee's heart had regular rate and rhythm, normal pulses and no rubs or murmurs; she had no edema or calf tenderness; and her sensory and motor systems were intact. (R. at 800.) Chest x-rays showed no acute cardiopulmonary process. (R. at 801.) Jessee was diagnosed with cardiac ischemia and GERD. (R. at 800.)

On March 22, 2018, Melinda M. Fields, Ph.D., a licensed psychologist, evaluated Jessee. (R. at 866-72.) Jessee reported that she spent time in the house and watched television. (R. at 869.) Jessee's hygiene and grooming were good; she was pleasant and cooperative; she made adequate eye contact; her mood appeared depressed; she displayed hand tremors; her affect was mood-congruent; her stream of thought appeared organized and logical, and there was no evidence of thought content impairment; her judgment was limited; her immediate memory was within normal limits; her recent recall was impaired; and her pace and gait were slow. (R. at 869-70.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Jessee obtained a full-scale IQ score of 63. (R. at 871.) Fields diagnosed major depressive disorder, recurrent, severe without psychotic features; generalized anxiety disorder; and intellectual development disorder, mild. (R. at 872.)

That same day, Fields completed a mental assessment, indicating that Jessee had no limitation on her ability to maintain personal appearance. (R. at 863-65.) She found that Jessee had a satisfactory ability to interact with supervisors; to maintain attention and concentration; to understand, remember and carry out simple job instructions; and to demonstrate reliability. (R. at 863-64.) Fields opined that Jessee had a seriously limited ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment in public; to deal with work

stresses; to function independently; to understand, remember and carry out complex and detailed job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 863-64.) She found that, based on Jessee's report of adaptive functioning, Jessee could not manage benefits in her own best interest. (R. at 865.) Fields also found that Jessee would be absent from work more than two days a month. (R. at 865.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2019); *see also Heckler v. Campbell,* 461 U.S. 458, 460-62 (1983); *Hall v. Harris,* 658 F. 2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 1382c(a)(3)(A)-(B); *McLain v, Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson*

-14-

*v. Califano,* 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Jessee argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) In particular, Jessee argues that the ALJ erred by failing to give controlling weight to the opinions of Dr. Vu and Fields, and by giving controlling weight to the opinions of the state agency physicians. (Plaintiff's Brief at 5-6.) Jessee contends that the state agency physicians' assessments were "stale [and] outdated." (Plaintiff's Brief at 5-6.)

The ALJ found that Jessee had the residual functional capacity to perform simple, repetitive, unskilled light work that required no more than occasional climbing of ramps and stairs, balancing, kneeling, stooping and crouching; that did not require her to crawl or climb ladders, ropes or scaffolds; that did not require her to work around hazards, such as machinery, rapidly moving parts, unprotected heights and vibrating surfaces; that did not require even moderate exposure to temperature extremes, excess humidity and pulmonary irritants; that allowed her to

-15-

use her left eye for occasional far and near acuity, depth perception, field of vision and accommodation in work that required little reading; that did not require performance of assembly jobs dealing with small items less than one inch in diameter or use of a computer monitor greater than two hours in a day; that did not require driving; and that required no more than occasional interaction with the general public. (R. at 21-22.) The ALJ also found that Jessee could attend, persist and concentrate for two-hour intervals with normal breaks as allowed by the employer, but that she was able to complete a normal eight-hour workday and 40-hour workweek. (R. at 22.)

In making this residual functional capacity finding, the ALJ stated that he was giving "some weight" to Dr. Vu's opinions, "significant weight" to the state agency physicians' medical assessments and "partial weight" to the state agency psychologists' assessments. (R. at 27-28.) While the ALJ, in general, is required to give more weight to opinion evidence from examining versus nonexamining medical sources, the ALJ is not required to give controlling weight to the opinions of a treating source. *See* 20 C.F.R. § 416.927(c)(1) (2019). In fact, even an opinion from a treating physician will be accorded significantly less weight if it is "not supported by clinical evidence or if it is inconsistent with other substantial evidence…." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Furthermore, the ALJ is entitled to rely on a nonexamining source's medical opinion where that opinion is supported by the record as a whole. *See Alla Z. v. Berryhill*, 2018 WL 4704060, at *11 (W.D. Va. Sept. 30, 2018); *see also* 20 C.F.R. § 416.927(c)(3) (2019).

The ALJ noted that she was giving "some weight" to Dr. Vu's opinion because he had the opportunity to thoroughly examine Jessee. (R. at 28, 656-59.)

However, the ALJ noted that more weight was not afforded to Dr. Vu because the opinion was vague with respect to specific work-related functional limitations. (R. at 28.) As noted by the ALJ, Dr. Vu's opinion does not indicate how long Jessee is able to stand, walk or sit, and he limited her to lifting less than 10 pounds infrequently. (R. at 28, 658.) *See Baldwin v. Colvin*, 2015 WL 1467050, at *12 (S.D. W.Va. Mar. 30, 2015) (affirming where "The ALJ gave Dr. Apgar's opinion some weight because it was vague and could not be relied upon. . . As a one-time examining physician, the ALJ was not required to give Dr. Apgar's opinion controlling weight. Dr. Apgar's opinion was vague in that he assessed marked difficulty standing, walking, sitting, lifting, carrying, pushing, pulling, and traveling. However, he failed to define the term 'marked' and failed to indicate the extent to which Claimant could perform these activities.") (internal citation omitted); *Adkins v. Colvin*, 2014 WL 3734331, at *3 (W.D. Va. July 28, 2014) ("Ms. Wilson's opinion is vague and fails to provide any specific limitations with respect to Plaintiff's ability to sit, stand, walk, stoop, bend, crawl, kneel, lift, or perform any other activity. . . . Accordingly, I find that the ALJ's consideration of Ms. Wilson's opinion was more than adequate, and I will overrule Plaintiff's Objection."). Here, Dr. Vu similarly spoke of unspecified limitations in these areas. (R. at 658.)

Dr. Vu's examination of Jessee was normal with the exception of tenderness of Jessee's right leg and lumbar spine and positive left shoulder drop test. (R. at 657-58.) Jessee's examination showed that her heart had a regular rate and rhythm with no murmur, gallop, click or rub; she had full grip strength in both hands; she had full muscle strength and tone in all muscle groups; she had intact sensation; her left shoulder drop test was positive; she had a normal gait and station; she was able to bend and squat without difficulty; she had no edema, cyanosis or erythema

in her extremities; she had no abnormal reflexes; she did not appear to be depressed or anxious; she was able to communicate with no deficits; her recent and remote memory was intact; and she had good insight and cognitive function. (R. at 657-58.) These findings are consistent with the other evidence of record, which shows that Jessee's heart had a regular rate and rhythm; she had no edema, cyanosis or clubbing; she had a normal gait; she had normal motor strength, tone and bulk; and she had no neurological deficits. (R. at 575-76, 581, 608, 611, 631,756-57, 800, 814.) Dr. Cavros noted that Jessee had adequate disposition for an exercise program. (R. at 576.)

While Jessee suffered a myocardial infarction, which required cardiac stent placement, her symptoms improved with treatment. (R. at 461-81, 499-534, 733, 754.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). It was routinely reported that Jessee's heart had regular rate and rhythm, and she had no edema, cyanosis or clubbing. (R. at 422, 575, 581, 608, 611, 631, 657, 756, 800, 814, 822.) Although Jessee sought emergency room treatment due to complaints of chest pain, dizziness and/or shortness of breath, her testing consistently was within normal limits. (R. at 622-47, 732-53, 796-816.) In addition, Dr. Cavros noted in October 2016 that Jessee's coronary artery disease was stable. (R. at 757.)

The ALJ gave "significant weight" to the state agency physicians' assessments, who opined that Jessee could perform a reduced range of light work. (R. at 27-28, 90-92, 105-08.) The ALJ noted that the state agency physicians' assessments were mostly consistent with the medical record as a whole. (R. at 27-28.) Under the regulations, the ALJ was entitled to rely on the state agency psychologists' and physicians' assessments. *See* 20 C.F.R. § 416.913a(3)(b)(1)

(2019) ("State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians."); Social Security Ruling, ("S.S.R."), 96-6p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."). As noted above, Jessee's examinations routinely showed that her heart had a regular rate and rhythm; she had no edema, cyanosis or clubbing; she had a normal gait; she had normal motor strength, tone and bulk; and she had no neurological deficits. (R. at 575-76, 581, 608, 611, 631,756-57, 800, 814.)

The ALJ gave "little weight" to Fields's opinion as it was unsupported by the record. (R. at 28-29, 863-72.) Fields opined that Jessee had mostly moderate to marked limitations in making occupational, performance and personal/social adjustments and that she would be absent from work more than two days per month. (R. at 863-65.) Fields opined, based on Jessee's report of adaptive functioning, that Jessee could not manage benefits in her own interest. (R. at 865.) The ALJ found that, aside from a depressed mood, Fields's examination findings failed to support the significant limitations imposed. (R. at 29.) Fields found that Jessee's hygiene and grooming were good; she was pleasant and cooperative; she made adequate eye contact; her mood appeared depressed; she displayed hand tremors; her affect was mood-congruent; her stream of thought appeared organized and logical, and there was no evidence of thought content impairment; her

judgment was limited; her immediate memory was within normal limits; her recent recall was impaired; and her pace and gait were slow. (R. at 869-70.)

As noted by the ALJ, Jessee had no mental health treatment during the period of review. (R. at 29.) The record shows that Jessee denied psychiatric and behavior problems, specifically denying anxiety and depression. (R. at 421, 573, 754.) It was reported that Jessee's mood and affect were normal; her behavior was appropriate and cooperative; her recent and remote memory were intact; and she had appropriate judgment and good insight. (R. at 422, 575-76, 581, 608, 611, 631, 756-57, 823.) Dr. Cavros reported that Jessee had no obvious mood disorder. (R. at 576, 757.) Jessee reported that she was independent with her activities of daily living. (R. at 656.) Dr. Vu reported that Jessee did not appear to be depressed or anxious; she was able to communicate with no deficits; her recent and remote memory were intact; and she had good insight and cognitive function. (R. at 657.) Dr. Vu opined that Jessee could respond appropriately to questions and carry out and remember instructions. (R. at 658.)

The ALJ gave only "partial weight" to the opinions of the state agency psychologists because they did not have the opportunity to review the results of Jessee's psychological examination and WAIS-IV testing. (R. at 28.) The ALJ gave Jessee the benefit of the doubt by limiting her to performing simple instructions and repetitive, unskilled work with no more than occasional interaction with the general public. (R. at 22.) Fields administered the WAIS-IV, and Jessee obtained a full-scale IQ score of 63. (R. at 871.) While the record contains evidence that Jessee suffered from significantly subaverage general intellectual functioning, evidenced by a full-scale IQ score of 70 or below, *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(B)(1)(a) (2019), there is no evidence in the record

that Jessee suffered from significant deficits in adaptive functioning manifested by either an extreme limitation in one or a marked limitation in two of the listed areas of mental functioning. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(B)(2) (2019).

The ALJ noted that she was giving "some weight" to the prior decision dated October 21, 2014. (R. at 27, 69-76.) Acquiescence Ruling, ("AR"), 00-1(4) instructs ALJs how to proceed when a Virginia resident's case file for "an unadjudicated period" includes "a final decision of [the] SSA after a hearing on a prior disability claim [that] contains a finding required at a step in the sequential evaluation process for determining disability." 2000 WL 43774, at *4 (interpreting *Albright v. Comm'r*, 174 F.3d 473 (4th Cir. 1999); *Lively v. Sec'y of Health & Human Servs.,* 820 F.2d 1391 (4th Cir. 1987)). The Ruling "applies only to a finding of a claimant's residual functional capacity or other finding required at a step in the sequential evaluation process for determining disability," such as the nature or severity of the claimant's medical impairment, that "was made in a final decision by an ALJ or the Appeals Council on a prior disability claim." 2000 WL 43774, at *4. The ALJ noted that, since the time of the prior decision, Jessee testified that her vision worsened; she had a heart attack; and she was diagnosed with mental health impairments. (R. at 27.) Thus, the ALJ provided additional residual functional capacity restrictions to accommodate for these new and worsening impairments. (R. at 21-22, 27.)

Jessee argues that the ALJ should have given the state agency physicians' assessments less weight because they were "stale [and] outdated," because they did not have the benefit of reviewing the assessments of Dr. Vu and Fields. (Plaintiff's Brief at 5-6.) However, the simple fact that those opinions came later in time than

the state agency opinions does not mean that they should be accorded greater weight. As the Third Circuit has noted, "[b]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); *see also Stricker v. Colvin*, 2016 WL 543216, at *3 (N.D. W. Va. Feb. 10, 2016) ("[A] lapse of time between State agency physician opinions and the ALJ's decision does not render the opinion stale.")

It is apparent from the ALJ's very thorough decision that she carefully evaluated the whole record before her when weighing the opinion evidence, and she ultimately found the state agency medical opinions were consistent with the record as a whole. Here, the opinions of the state agency physicians that Jessee could perform a limited range of light work were consistent with the evidence. Based on this, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and her finding that Jessee had the residual functional capacity to perform a limited range of light work.

Based on all the above, I find that substantial evidence exists in the record to support the ALJ's finding that Jessee was not disabled. An appropriate Order and Judgment will be entered.

DATED:     January 19, 2021.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE